allotted to counsel. The first case today is 148015 in re. JPMorgan Chase Bank, NA. So I know there are a number of issues that could be discussed. And just to set a little bit of a framework as to the merits we're talking about, three, potentially three cases of documents, one of which there is no disagreement on at this point, I think. Yes. And so we're really talking about the middle and the third categories. Is that right? The transactional documents that are just check bases and so on and so forth, that's the third category. There's no dispute that they're not privileged. It's just that we're in the middle category of evaluative documents that we'll be talking about here. But is there a dispute over whether documents might fall into the second or the third based on the magistrate judge's ruling? She really didn't make that determination. She didn't make that delineation for that. So we're in the middle category. We're in the middle category. That's right, Your Honor. Thank you, Laura. Thank you. And thank you for hearing us. We would like to reserve four minutes for rebuttal if that's okay. And in the 11 minutes that I have, I'd like to focus on two issues with the Court. The first is the policy underpinnings for the Bank Secrecy Act and why these evaluative documents in that second category fits squarely into that. The second is why a writ and why intervention by this Court is very much necessary here given the pervasive use and referral to both privileged and potentially privileged documents in the course of this litigation. Going back to on the first issue, the policy underpinnings for the Bank Secrecy Act. As we indicated in our briefs, in 1992, Congress took a very big step forward with the Anunzio Wiley anti-money laundering provisions of the Bank Secrecy Act. And there, they said banks must not only monitor suspicious activities by their customers, but they need to investigate and detect and report those suspicious activities on these aptly named Suspicious Activity Reports and send them off to this newly created agency for that very purpose. It was very controversial because this was in the absence of the Act and that provision. Banks do not have a duty to investigate their customers. But Congress said for law enforcement purposes, because you are on the front lines, we need you to go out and be our detectives for this at your own expense. And so all the banks went out and they dutifully, we included, created this machinery around this Congressional mandate. We accepted that partnership. We set up specialized anti-money laundering units just to investigate under the anti-money laundering statute of the BSA. And this was totally separate and apart from the bank's risk management or loss protection types of activities that they do. The bank does that on its own, but it had separate units for just responding to this Congressional mandate. Imagine if you will... Counselor, you're talking about the Congressional mandate. When I look at the statute, I only see two things. One, in addition to requiring the reports, one is don't notify the target that they're being investigated. And two, the bank won't be liable for making the report or failing to tell someone that they're the target. That's it. Right. And then we have some regulations which seem to stretch that quite a bit. And then we have some lower court decisions that seem to stretch it a bit more. I'm having trouble back at the language where I see Congress saying don't notify, don't reveal to the target that they're being investigated. How that's implicated here after the target long ago knows there was an investigation, the report is all out there in the public domain, there's no more revealing that could happen. Yes, yes. There is that regulatory structure that has been enacted in the wake of that statutory construct. And I think the best answer to your question is to look at the regulations that were adopted by both FinCEN and the OCC and the commentary by FinCEN and OCC around that. And the policy reasons, and in fact there is a decision, the Weill decision that addressed the whether that regulatory structure was within the appropriate delegation of powers by the statutory provision. But in that regulatory structure, and I would refer your honors definitely to the comments made by both FinCEN and OCC, we have appended the FinCEN's comments to those regulations as Exhibit G, but the OCC comments as well, which we cite in our brief, are very, very revealing. They're at 75 Federal Register 75576. And what they say is because of this structure, because the statute actually goes a bit further in the sense that it says you must detect and report suspicious activities, and you must keep records. Thou shalt keep records of what you do. The records are not submitted with the SAR, but you must keep those records. Keep them for five years, and if law enforcement asks you for them, then you give that to law enforcement. But come back to the point. They're already out there. Pardon? They've already been revealed. The documents, those investigative documents aren't revealed. They are kept by the bank. But what Congress was concerned about don't reveal to the target. That's long ago happened. Well, what has happened, what the OCC and what FinCEN said is they list a whole bunch of reasons why that entire investigative file must be kept. Congress lists one reason, one policy reason of, you know, thou shalt not notify the target. But OCC and FinCEN elaborate on that in their commentary, and they give a whole host of reasons, but two of them are most important here. The first one is that if that investigatory file, which would not exist but for this whole statutory machinery, wouldn't exist at all. If that were ever made public to private litigants or so on and so forth, then there would be a predictably chilling effect on the banks, the scope of their investigation, and the documentation that we find helpful to us. Can I ask you a question about that? Sure. Because as you point out in your briefs, at least a couple and perhaps a number of the district court cases pick up on that point. Yes. And that's one of the reasons that they feel that trying to put the cat back in the bag may be worthwhile. It makes sense to me. It makes some sense to me anyway. But in other areas where we have very similar concerns, and what immediately comes to mind for me is grand jury testimony, which is absolutely sacrosanct, and yet it is used routinely in criminal cases. And it would seem to me that you would have almost exactly the same sorts of pressures on individuals. They might be unwilling to come before the grand jury. They might cabin their testimony, et cetera. And yet things seem to have worked out OK. And I'm trying not to make this a compound question. But in your petition here, you have one line where you say, look, the SEC used some of this stuff. And it was publicly disclosed at the bottom of page 7 of Appendix A to your petition. The SEC used this stuff, whether it should have or not. Right. That's exactly what happens in these grand jury cases. And then, as Judge Kayata said, it's out there. Why should we try to turn back the clock and put all this stuff back in the box at that point? Well, the reason why goes back to what I was talking about. In the absence of this statute, these banks would not be conducting these investigations. They would not be gathering these documents whatsoever. So if we don't reverse, then your client is going to stop doing these investigations? No, of course not. Of course not. Congress has required them to do it. Yeah. You're required to do lots of things. Doctors are required to report patients under certain circumstances, et cetera. Right. But Congress didn't create all these other things that you're now pointing to district court opinions somewhere that have extended this to cover everything. Well, I think, again, we go back to the first thing in the OCC commentary. You know, the folks that are enforcing this. And they make it very clear as to why it's important to them that all of that be kept sacrosanct. Now, to go back to your Honor's question of, you know, it works out okay in the grand jury type of test. I need you to once again explain how is it sacrosanct in this case when it's already out there? And what good is clawing back going to do when half of it is over the Internet already and it will forever be on the Internet? Well, there's two things to it. Okay. Going first to the SEC and then we'll go to the Internet piece. On the SEC piece, I think that you have to look at it in terms of the chronology. I mean, the investigation was done at the end of February. The SEC, we froze the accounts on March 9th. The SEC had to move very, very quickly to go forward and get all of their case pulled together. They drafted the affidavit. But bad for us, we didn't catch that there was the potential that that affidavit could be interpreted as part of a BSA investigation. We didn't stop that. But that being, that's just one piece of it. But we have an entire investigative file that if that becomes public, then you provide a roadmap for all the future bad guys who say, oh, those chase investigators, this is how they conduct their investigation. They ask this question. They ask for this document. But if we want to evade it in the future, this is exactly what we need to do. Now to go back. But before you move on, I mean, the district court indicated that there might be parts of it in between a set of documents that need redacting. And why wouldn't we leave it to the wisdom of the district court to understand what in those documents might be harmful to the arguments that you're making and therefore appropriately limit. The OCC and FinCEN already addressed this issue. When they were interpreting the scope of the regulations in those regulatory federal register sections that I just quoted, there's some commentators that said, well, we could just, you know, redact out, you know, the reference to the SAR and so on and so forth. And FinCEN and OCC had to have none of it. We need to keep the entire investigative file secret or privileged because otherwise it would reduce the incentive for full and thorough investigations. And second of all, it provides that roadmap. So they addressed that question very directly. Thank you, Your Honor. Yes. Judge Thompson still has part of her question pending. Oh, about the Internet. Of course. Of course. In this day and age, it is, I mean, to have the idea that somebody could take a privileged document and put it out there on the Internet and because somehow, you know, that got out there and it was absolutely improper that that was done, but that somebody else could then come back in and take a privileged document and use it in court, there's no case law to say that that's okay. The Dukes case that we cite, there are a number of cases that deal with that for the attorney-client privilege, which can be waived. This is a privilege that cannot be waived under any circumstances whatsoever. By the institution. By anybody. You look at the OCC's amicus brief that they filed below, they answered this question absolutely directly. They said no matter how one gets these documents, if they're privileged, they are privileged, and there is no use that can be made. If the OCC decided, intentionally decided, to publish a number of old reports on the Internet for one reason or another, if they did, that would be a waiver of privilege. It may be a breach of statute. It would still be a waiver of any privilege that they might have had. A waiver simply intentional and involuntary relinquishment of a right. That's what they would be doing. But I at least take your point that a bank, to the extent that the bank can assert the privilege, and I understand there may be some question about that, although not in your mind, that the bank can't waive it in any event. Yeah, and the OCC says no one can. No one can do that. I just told you that I completely disagree with that statement. Oh, but I mean other than potentially the OCC. There is a statute. There is a regulation that's specific, and that regulation says that it cannot be waived,  It cannot be waived. You're talking about a statute. You're not talking about what we think of when we as courts think of voluntary relinquishments of rights. Here's where you're losing me, though. In response to Judge Thompson's question, you make the good point that, well, the fact that it's already been revealed doesn't necessarily mean the privilege has been waived, and so perhaps you can stop the use of it even though it's been revealed. Of course. But we're sitting here in a mandamus proceeding, and when it comes to the use as opposed to the revealing, it seems to me that can be remedied in normal course after the fact in a normal appeal. We wouldn't usually sit in a mandamus proceeding to say that a district court should or should not have allowed certain evidence to be used in discovery or at trial. Well, I think here, because it's privileged information, and not only has it been revealed to the court and really taint those proceedings, but it has been, you know, they've used it to create the amended complaint for this. Right, but if you write on all of that and you should lose at trial, you'll be back here saying, flip this verdict because they used all this stuff that was privileged and the court was wrong, and if you're right that it was privileged, then you'll be fine. Well, we're also presented right now with a court order to say, thou shalt produce all of the rest of your investigative files using this criteria that we believe is the inappropriate criteria under the Bank Secrecy Act and under the very clear guidance from both FinCEN and OCC. Before you step back, I would like to follow up on Judge Kayada's question, because I have the same one, and I'm not sure I got an answer from you that I'm quite satisfied with. So we do have this doctrine of advisory mandamus where we think, if we think that the district courts are using a procedure that's wrong and there's not likely to be an opportunity for review in cases going forward, we might take that opportunity to fix it. Here, this seems to be almost a one-off. This is the first of these cases that I have seen, so I would just ask the follow-up question. Really, why should we be deciding the questions that are important to you in a mandamus proceeding? I know they're important in the case, but are they important in terms of the general distribution of justice? Sure, sure. Because if there were a divulgence, a production of all of this information, it gets used in the course of trial. Again, we go back to that policy reason. It provides a roadmap for any future litigants. I mean, every single piece of work that those investigators did is information that provides a roadmap for future fraudsters to say, oh, that's how they conduct their investigation. So for that to be brought forward in evidence, not just for this case, but for all future cases, the OCC and Fenton say that shouldn't be the rule. We can't let that happen, because otherwise this whole machinery, the whole underpinnings of this machinery begin to break down. But I thought the whole investigative file was turned over to the Bankruptcy Council for the bankruptcy trustee. Part of it, well, there are a couple of pieces to it. There's part of the file that was given to the SEC and then to the trustee, but the plaintiffs have asked for, and the court has ordered, that all investigative materials, whether it was for an investigation conducted at this time or any time in the past, the entire kimono be opened. And so there is, it's not just these documents. There are future documents. There's an entire investigative process. What evidence is there that there is something in the incremental batch that you say hasn't yet been turned over? There's something there that shows some secret investigative technique that people would not normally think. I mean, anyone who knows how a bank works knows pretty much generally how they go about spotting money laundering, but I don't doubt that each bank may come up with something. That's right, that's right. But where's the evidence before the magistrate that there was that secret to the vault in this incremental batch of information that wasn't already revealed? Well, here's the point, that right now the pieces of the investigation have been produced. I can't even tell you what else might be out there. I don't know. The court doesn't know what is out there. What we do know is that whatever is out there, again, reveals however the bank was going to do and did its investigation as a road map for anybody who wants to see that in the future. I just have trouble trying to figure out why we should not allow the district court to sort through this and make a determination as to what you are alleging is a part of this unit as opposed to whatever unit that would constitute ordinary good banking policies. Before this was created, there had to have been something in your bank that allowed you, not necessarily you put it in terms of investigating your customers, but to just flag any possible fraud, which could be money laundering, that was going on that would be of a business concern to the bank. And the affidavits that we submitted to the court addressed this directly. We had the affidavits from the lead investigator, Gina Ward, who talked about this investigation, but then John Dyer, who was with Gina Ward, Richard Alanese was her supervisor who produced the documents to the SEC, and John Dyer, who is their supervisor's supervisor, said we have two different lines of authority in this bank. One is to risk prevention, loss prevention, for our own purposes. This investigation, this unit, the AML unit, it exists solely because of this congressional mandate, and that's the unit from which this investigation sprang. My point is, to me that doesn't mean that there's not overlap. Even if you call this unit this, and you say that this unit is strictly doing X, Y, and Z, to me that doesn't suggest that there's not necessarily some overlap, and that the district court is in the best position to sort through the documents as they do in so many other occasions when they have to make decisions about what is and is not privileged. I have two responses to that. Number one, the Norton case dealt with that directly. They said, you know, sometimes there is overlap. In this case, the evidence was all, I mean, these are investigators. They sit in a separate unit from any of the other folks, and that's where this investigation started and ended. The Norton case addressed that issue of, in those cases where there might be some overlap, that still doesn't detract from this policy. You notice that in the regulation, it says, and the regulatory commentary, it says, materials prepared as part of the process, not the sole reason. In this case, it was the sole reason why this investigation was done. It was initiated on an alert that came up from that unit. It did not come from an external referral. It was solely based within this AML unit. So, I mean, even if the district court might try to reach that conclusion, there is no evidence, nor is it just the way that it works in the bank structure. Thank you, Counsel. You've reserved some time. Yes, thank you. You can be sure we'll give you enough time as well. May it please the Court. My name is Keith Miller. I'm attorney for the plaintiffs in this action, respondents in this proceeding. Your Honors, I'm rarely at a loss for words. Maybe you've looked at some of my transcripts. I find myself in a very difficult position before you today because there has been statements made on the record in orders that somehow I am under threat of sanctions by this court. Having opened this court for an open hearing and have restricted the use that I may make of facts and circumstances, I'm very intimidated by the circumstances. I must tell you, I've been doing this 32 years. I've stood up and argued in every court in the Commonwealth of Massachusetts except this one today, and I'm very honored to be here. But I've never felt intimidated before. So under those circumstances, I just want to tell you that it's an open court. There are things that I don't want to tread on to the extent that I feel that somehow you're going to step on me down the road because of what I say, and that troubles me, and I just want you to know that. Is there something that you were going to say that is not in your papers, and is there some reason that you can't do a subsequent filing to cover this? Oral argument is a privilege. It's not a right. We thought we understood what was in the papers, and I do understand that there are issues that some color might be helpful to you, and nobody intended to prevent you from dealing with that. But I've been sitting on this court for 12 years, and I've never been in a closed hearing in 12 years, and we have dealt with classified information, terrorism trials. I'm disappointed that you feel intimidated, and there's no reason why you should. Okay. Well, I'm not easily intimidated, but I must tell you, I've read your orders, and if you want to speak briefly to the situation that resulted in that one filing going out that I recognized within three minutes because I was looking for it, and it was an inadvertent oversight. Counsel, you can argue the case however you want, but speaking only for myself and my colleagues are not shy about speaking for themselves. We're really interested in the legal issues in the case. And I understand that. Okay. Let me go very quickly to a motion that we filed yesterday. I want to spend two minutes on it. You issued an order this morning. I did read it, and it was deferred to the group here. These documents are only important because I think, and I'm just 30 seconds, my sister even today is talking about the genesis or the origins of the Stein Declaration. That's what she was talking about. She was also going to facts that I don't think are properly before you. But that in particular, and given the repetition again of the genesis of those documents, is very problematic for me. I asked you to include in the docket the request for certification that for some reason was left out. But in that document, she reiterates things that she said at a motion hearing probably a year ago about how this thing came into being, Mr. Stein's affidavit. I hope you will see, I'm very comfortable having talked to Attorney Brandt yesterday, that that document will be available from the court in Texas and will probably be available today. And when you see that, you are going to see that, and again, here we are. I don't want to talk about what's in it. It's under seal. Believe me, I've tried to do the right thing from the very first day here, and we can talk to that for a minute. But you will see that statements that have been made in court filings are false. And I'm going to go further than that. So when that document becomes available, I think it will become available. You will see the circumstances under which the Stein document arose. And I have always believed and continue to believe today that in the ordinary course of business, in regular course of business, you've seen it, that appears in that repeatedly, was lawyering. And that's essentially what you're going to see, is that document was lawyered before it was signed. Okay, so we have a magistrate judge's ruling here. That's what the petition for mandamus has come from. I assume there's enough in the record for us to be able to decide the case that's in front of us. Am I mistaken about that? You absolutely do have that. But there are statements on the record, and it's a record that's before you now, because that transcript is in, of what Ms. Bowen said in court about what happened with that document. Friday, 6 p.m., signed on Monday and thrown into the court. It's belied by what I believe you will see. So I'll leave it at that. The transcript that was provided was partial. I think you should see the whole transcript of that hearing. And I don't have it. She has it. She should give it to you. And that's all I'll say about those things. My matter of interest, intellectually or otherwise in this case, is the standing issue. You probably know that. And you may have questions for me about it. I think it's really what this is all about. And I am mystified but not surprised that the empty chair over there, which is the OCC who filed an amicus brief in this case and was given notice of all of the proceedings, every single document that's been filed under seal and district court, is not here today. And not only are they not here, but you may have seen that they had an opportunity to become electronically certified to get copies of what you might order or decide. And an order was issued by this court on the 29th of May saying, the following will not receive notices. And the person who doesn't receive notice is Peter C. Koch, your OCC in-house lawyer who filed an amicus brief. So we keep talking about this privilege. The bank apparently thinks it's their privilege. I don't think there's any question under the case that the privilege belongs to the OCC. The OCC is so interested in the protection of these private documents that it didn't bother to register electronically to hear what this court has to say. But, Counselor, that happens a lot. I mean, the federal government has, there's over a million of these things filed every year. The federal government's got limited resources. They don't intervene in any case. We could read that just the opposite. We could read it as saying they know that J.P. Morgan has standing and they know J.P. Morgan has the, Chase has the assets and resources to hire counsel to do it. Why add? We could infer. So I don't think it helps you much for us to draw an inference that they're here or not here. And I just, under the circumstances, I just would respectfully disagree with you and it's just a matter of interpretation. I think the OCC looked at this. I think they have a form, amicus brief, basically that they churn out whenever requested. I think they put it into this court and it's in this court and my sister has given you probably like 20 other ones from other cases. They're all virtually the same. The interesting commentary from the OCC from my perspective is the Coquina case and we don't have to get into details of it, but that's where they were asked to do something very specific by a trial judge in the middle of a trial. And what they did was completely inconsistent with all the generic language. And you will see Judge Dean in the transcript that was supplemented was very interested in that and was quite surprised by it because she said in open court, under seal I guess, I've got to be careful here, am I the only one who's taking this thing seriously? This privilege, this privilege that belongs to the OCC and it has been asserted by the bank in this instance not to preserve secrets, not to do anything other than to avoid the reality of this case where they didn't do something that they were supposed to do and they did significant research on the problems associated with the customer and as a consequence of that a lot of people lost a lot of money. That's what the case is about. Help me, I'm confused on this privilege. If Chase's interpretation of the breadth of the statute as informed by the regulations and discussions and court decisions were correct, then you have a statute and a regulation that says Chase shall not do something, like give you stuff. So why wouldn't Chase, if commanded to do something in violation of that mandate, be precisely the person that would have standing to say we shouldn't have to disclose it to you because we're ordered not to? I agree with everything you've said and if it was discovery in a case and it was the exact same circumstances, they could assert the privilege as the cases all indicate that they can and they would be able to defend it. There was a time under the regulations where you could challenge that and you could go administratively to the OCC and have a hearing on that. They used to call it a TUI hearing. At some point in time Congress didn't like that and they changed it. But there was a TUI process and in fact the TUI process at the time I think was still in force in 08-09. But yes, discovery, a request for discovery, they can refuse. They also have to do certain things. First they have to notify the OCC. It's a side issue here, but in this case they didn't notify the OCC and I argued that way back to the trial judge. If they could resist the discovery, then what are you saying they don't have standing to do? These documents came, the chain of custody as I understand them, and there's two sets of documents. The chain of custody was subpoena from the OCC and that will come up in this document you're going to see. OCC, I'm sorry I said the OCC, SEC, I stand corrected, no notice to the OCC, subpoena from the SEC, arguably law enforcement, SEC gets them in their possession, turns them over to Mr. Roper, court appointed receiver in the Texas case who I had had relations with for years. He wouldn't return my calls, I was trying to get information, understandably because I had a civil case. He's got the responsibility to collect assets, the stolen assets of the receivership, and I reach out to him at a point in time when he suddenly has an interest in talking to me, and that's a whole sideshow. He's a receiver, a federal court receiver? Yes. Appointed by the federal court on motion of the SEC? Yes. Judge O'Connor in Texas, District Court, makes him the receiver. He gets these documents. It appears subject to a confidentiality agreement, private as between him and the OCC. He effectively doesn't look at the documents, makes a decision to let me review the documents. Is that document in our record? In the District Court record? Yeah. Okay. I've never seen it. I just believe that it exists. But he then turns them over, he gets these documents, they are engrossed, there are lots of documents, and there was a challenge, which is a sideshow also, but there was a challenge to whether it was inadvertent, that was reviewed by the court in Texas and deferred here, and I was able to defeat that by hiring an attorney down there. He gives me these documents. I'm in a conference room at his law firm. He turns them over. They're so voluminous, I make a request, can I make a USB copy of these and take them home, because I can't possibly look at them in a half a day in Dallas, Texas, in his office. He gives them to me. I leave, and none of this is in dispute, I don't think. I walk out of there. It was a voluntary production. Apparently at that point in time he was subject to a confidentiality agreement. More interestingly is the subsequent set of documents that now have appeared in the Fond case in Missouri, because those documents there was no confidentiality agreement. Chain of custody. SEC to, and this is not properly represented in the papers, banked SEC, SEC to receiver, subpoena of the U.S. Attorney's Office to receiver. Receiver then turns over documents to the U.S. Attorney's Office, who without a protective order turns over the documents. Same investigative file. It's the same 441-page investigative file we're talking about today. Goes to the U.S. Attorney's Office. He produces them in discovery in a pending criminal procedure to a defendant's counsel. The woman's name is Jacqueline Hoger, one of the perpetrators of the scheme. And then that attorney apparently turned them over subsequently without any restrictions, without any protective orders. Obviously understanding, and I would assume investigating whether it was appropriate or not, to counsel in a plaintiff's case, similar case in Missouri. This is some suggestion that these privileged documents were improperly put out there. The lawyer in Missouri apparently created a complaint, attached documents he obtained from an attorney, a defense counsel, not subject to a protective order, and he put it in the court. He didn't put them on the Internet. He put them in the court. And there's these crawling companies that pull them up and they put them out there. And that's how the documents get out there. As I understand it, within a day, JPMorgan races in and gets them sealed up, much like they did here, much like they did elsewhere. And here we sit. I believe from day one when Roper gave me those documents, in ignorance at that time, I believed that I could have done anything I wanted with those documents, including putting them on my website, 441 pages, 6,000 pages. I thought I could have done that at the time. I did not. I'm being pillared in these papers, you've seen it, for doing what I consider to be the right thing. I took them. I gathered them up. I called Mr. Roper the next day and told him what he'd given me. There was an index that had been created that said Chase investigative file or something like that. So I knew right away what I had. And I looked at it and I said, ooh, this is good. Called him. We need to know legally if you think they're privileged or not privileged. They're here saying they're privileged and they want to claw them back. I think that there is a privilege. I'm sorry, I didn't mean to interrupt. There is a privilege. It's the OCC's privilege. It's uniquely for the OCC to assert it, as happened in Hassey. They sent out their clawback letter and Hassey gave them back. You saw I briefed that substantially. In the Texas case, Hassey, in a similar circumstance, the bank became aware of these documents that had been produced. They called the OCC, as is required. The OCC said, give them back or we're going to prosecute you. Well, if at the appropriate moment I'd received the same communication from the OCC, I would have had a problem. I think I would have had to give them back and then go fight about it. The OCC knew about it. They've known about it for now two years. They have not done that. It's the OCC's privilege. It is not the bank's privilege. And my position to the judge before and to you right now is if the bank is asserting the OCC's privilege, there's only one way they could do it. Because I understand the law. It's through agency. And I think that presumption or that assumption is nothing short of ridiculous, that a private bank could act in an agency capacity for the United States government. It can't happen. So what we have now is we have these documents. I put them into the court when I think I could have published them. They are privileged. They were privileged. It's the OCC's privilege. I do think there's an estoppel. At some point in time, they might outweigh the privilege. But if they came in tomorrow, let's say you rule and you say have at it. You deny the motion or the petition. If they came to me now and said, okay, we've watched the proceedings and now we've decided that we want those documents back, I would fight that one. I would fight that one. When you talk about a privilege, are you talking about a privilege against revealing, answering, disseminating, or are you talking about a privilege against allowing the use of a document? Two different things. The judge has ruled in this case that the, am I allowed to say it, the SAR? That electronic thing that's out there on the Internet that's four pages long that has a long narrative, very descriptive, that that's privilege. I requested certification on that. I said that they didn't have standing to make this argument. She denied it. I let it stand. That is outside of my purview right now. I've now filed, she made sure you saw it, I've filed motions. I've done the same thing I did with you. I grabbed it from the Internet verbatim, as we can all go look at it today, and I popped it on a piece of paper and gave it to you, and you've sealed it up. They've sealed it up in Missouri apparently, and it's sealed up here. I think all that is futile. I think that now it's out there. It's not coming back. I think all of the arguments that may have existed before this event involving the Missouri case, it's different. But what we have behind it, and really I haven't gotten to here, is investigative documents that a judge in the district court on factual findings has determined are not privileged. The privilege does not apply. And I don't think there's any evidence of clear error that would suggest that she made a mistake, and it goes back to the Stein Declaration. She relied on the Stein Declaration, his first affidavit. She said his second one, which was trying to retract from a very bold statement that was lawyered up by J.P. Morgan with a different prerogative at the time. We can discuss that because this is an open document. It is quite clear to me, subjective interpretation, it is quite clear to me at the time the SEC requested that declaration, in February or March 2009, J.P. Morgan perceived two things. First of all, it had a problem because it hadn't done the proper reporting. It had done those things, but it hadn't done the follow-up, which was contacting law enforcement. And it was seeking to be able to assist the SEC with certain baggage sitting behind it with an active, aggressive attempt to stop this fraud. And it went out to be lawyered with certain statements probably prepared by the SEC. And is it a coincidence that three times in that document it says ordinary course of business, regular course of business, and the regular course of business, over and over again? Here you've lost me. I thought the magistrate relied on much more than that, and I would hope she did, because part of their business under federal law is investigating and reporting. So you're always going to throw into an affidavit preparing the ordinary course of business to indicate that it falls within the hearsay exception. But it's not, they didn't say we did this and that. Part of our ordinary business that is unrelated to SAR reports. Well, again, respectfully, I disagree with you. I think that they had a problem, because if they put those statements out as a public document, without saying that, they risk violating the BSA and the AML. There was a problem there. They knew this was going to be a publicly listed document, and they had to make sure that by saying those, let's say they said we found this out in the course of an AML investigation, which is the suggestion here now. Well, they would have been violating the act. They couldn't have done that without it being under seal. And they weren't in the position to say, well, you have to seal this. I think they did it for a different reason. But now you're relying on the circumstances, which is what the magistrate relied on, not just the recitation that you'd see in virtually any affidavit from a business. Absolutely all the circumstances, and much more importantly, and this goes to something Ms. Boland talked about, and I'll leave it with that. She talks about this secret process, and this is the overriding reason that you have to do certain things or don't have to do certain things, the process. You've got to go look at these documents. They were using LexisNexis software to do this super, super secret stuff they're doing. It's a LexisNexis program designed for anti-money laundering. So you and me can go and sign up for this tomorrow, and it will be the same investigative research. And the judge noted that in her findings. Counsel, does that not suggest perhaps another analytical question for us? When we opened, I attempted to frame this up as three categories of documents, and it's subsequently been stated that two of those categories are basically evaluative versus underlying transactional. Didn't the magistrate judge establish another category? Took documents that might look like they are evaluative, but said, but these are the same kind of documents that would be produced in any routine, as opposed to, is it AML? AML. AML. AML. Money laundering. AML. Investigation. And so these are really in another category under the circumstances of this case. So what have I just stated that's incorrect? I think you're correct. But I guess what I would say to you is that my assessment of the investigative files, and I now have two. I have now the precursor to the October whatever you call it. And this is just collected information, copies of checks. One thing that's very interesting is the checks that previously, at a different time in this case, were argued a bank would never look at, they're all duplicated. The investor checks that said on them, there's a check in a file that says, there's many of these checks, but you know, so and so, you know, Tom, whatever you call it, from Missouri or from Illinois or whatever, writes a check for a million dollars. There's one with a million, and he puts on it, CD, nine and a half percent. It just seems to me that, you know, that can all be a matter of degree, and it's a question of where one draws the line. And frankly, if that's what this mandamus petition is based on is where that line was drawn, well, perhaps you can tell from the tone of my voice that it may not go very far with us. And I think my co-panelists have both asked questions along those lines. But I thought there was something else at stake here. I mean, I think you have to distinguish between the judge, and, you know, while I may have disagreed with Judge Dean, I think she was very thoughtful about this whole process. And what she did was she said, there is a category which is actually the SAR. And she perceived, and I don't think there was any disagreement based on representations, there was a SAR, and it was protected. She made that ruling. I think, I mean, I have asked her, and I will ask her to reconsider that, or maybe you're going to make it easy for me, that that is no longer an issue because that document, we know, is out there. Notwithstanding all the argument, it's out there, that document. The investigative file behind it, I have it. I don't think you can restrict me. I've read these cases in Ray Rafferty. I could put that, I think, on the Internet tomorrow. If you told me not to, I would risk all these consequences. But the way I got that document, and without even her making a ruling, as things stand today, I just don't see why that document isn't something that is available. Now, I guess the court doesn't have it. It doesn't have it. But her categories were documents that refer to a SAR, and what she now believes, I think, is that according to the Coquina case, what you do is you just redact. If you see something that says that there was a SAR file, a reference to a SAR, you redact, which apparently they did in the Missouri case. And that's what the Coquina letter from the OCC seems to infer, much to her surprise. And perhaps yours, all these amicus filings, but here's real world, just redacted. So there's those documents. I'm going to have to wrap up. I've been watching the clock. You can be sure we gave you even more time. You know what? Thank you. I talk too much. Thank you very much. Thank you, Your Honors. I know you reserved four minutes. We are really hoping you don't use very much of it. Okay. The brief issue that Your Honors raised before that I'm not sure that I answered as well as I could have, which was this issue about why do we need to give mandamus relief right here? Isn't this just like some discovery issue and documents are put in? This is very, very different. You have banks that the only reason why they collect and investigate these documents, these activities, is because Congress said thou shalt do so and that they have been promised by at least the regulators in their interpretation of the statute that these will be confidential. We then give them to law enforcement when they ask for it, and we cooperate with law enforcement. Now, law enforcement did a lot of things with those documents that we in good faith never would have thought would have been done with these documents when they were created and then given over. And the thing I would point you to is the Alanis letter from that investigator who, when he gave those documents to the SEC, he was very clear about the source of them and therefore his belief that they would be privileged. And if one opens up the, as I said, the kimono here about and just allows all of that, that was gathered with that promise, really, that it would be kept privileged, it would defeat the purposes of that entire machinery and also, as I said, create the roadmap. And the one thing that I would say, because of course your honors would have some questions about that affidavit that was filed in Texas. As I said, the SEC came to us and we had produced documents. They prepared that affidavit. That on us that we didn't catch potential problems with that affidavit, but it does not somehow with the stroke of a pen erase all of that structure and infrastructure and machinery that goes into that investigative process that would be threatened if banks, when they collect that, it can just be wide open to the public and used against them in civil litigation. Thank you. It's an interesting case and we will do our best.